**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **LISA R. BROOKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 5:10cv00104** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **By:  Michael F. Urbanski** |
| **Commissioner of Social Security,** | ) | **United States District Judge** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Lisa R. Brooks ("Brooks") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act").  On appeal, Brooks argues that the administrative law judge ("ALJ") erred by failing to resolve the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles, erred in his residual functional capacity determination, and erred in finding plaintiff can perform her past relevant work as a cashier and production inspector.  Having carefully reviewed the administrative record, the court concludes that the ALJ's decision is supported by substantial evidence.  As such, the Commissioner's decision is **AFFIRMED**, the Commissioner's Motion for Summary Judgment (Dkt. #16) is **GRANTED**, and Brooks' Motion for Summary Judgment (Dkt. #15) is **DENIED**.

**I.**

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits.  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001).  "Under the Social Security Act, [a reviewing court] must uphold the

factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard." Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).

This inquiry asks whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work.  Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520).  If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

At the time of the ALJ's decision, plaintiff was 33 years old (Administrative Record, hereinafter "R." at 18), and is considered a "younger individual" under the Act.  20 C.F.R. §§ 404.1563(b), 416.963(b).  Brooks has a high school degree and previously worked as a cashier and production inspector.  (R. 18.)  She stopped working in June 2007.  (R. 12.)  Brooks filed an application for benefits on August 23, 2007, alleging disability as of January 1, 2006 due

---

[1] RFC is a measurement of the most a claimant can do despite his or her limitations.  See 20 C.F.R. §§ 404.1545(a), 416.945(a).  According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p.  RFC is to be determined by the ALJ only after considering all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain).  See 20 C.F.R. §§ 404.1529(a), 416.929(a).

to diabetes, obesity, torn arm tendon, hernia, locking knees, depression and anxiety.  (R. 9, 10.)  The Commissioner denied her application for benefits initially and again upon reconsideration.  (R. 9.)  An administrative hearing was held on June 23, 2009.  (R. 21-59.)

In a decision issued September 29, 2009, the ALJ found that Brooks had severe impairments consisting of diabetes, obesity and back strain with shoulder problems.  The ALJ found that Brooks' reactive depression/anxiety did not qualify as a severe impairment under the regulations.  (R. 12.)  Considering these impairments, the ALJ found that, at a minimum, Brooks has the RFC to perform simple, unskilled sedentary work that permits her to alternate between sitting and standing.  (R. 17.)  Based on this RFC and the vocational expert's testimony, the ALJ determined that Brooks can perform work as a cashier at the sedentary level and as a production inspector at the sedentary level, jobs that exist in significant numbers in the national economy.  Accordingly, the ALJ concluded that Brooks is not disabled under the Act.  (R. 19.)  The Appeals Council denied Brooks' request for review and this appeal followed.  (R. 1-3.)  The parties filed briefs in support of their respective positions.  Neither party requested oral argument pursuant to Local Rule 4(c)(2).  Thus, this matter is now ripe for adjudication.

### III.

Plaintiff first argues that there is a conflict between the vocational expert's ("VE") testimony and the Dictionary of Occupational Titles ("DOT"), and that the ALJ violated SSR 00-4p by failing to resolve it.  Plaintiff asserts that the ALJ was "required to elicit a reasonable explanation for the conflict before relying on the VE's testimony," and to "inquire, on the record, as to whether or not the VE's testimony is consistent with the DOT."  Pl.'s Br., Dkt. # 15, at 3.

Social Security Ruling 00-4p indeed requires the ALJ to inquire about any unresolved conflict between the DOT and evidence offered by the VE.  SSR 00-4p states:

4

> Occupational evidence provided by a VE or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

With respect to this issue, the colloquy between the VE and the ALJ went as follows:

> VE:    … [C]ashiers is [sic] the most prevalent job in the national economy and the state economy at this point with that description, 17,000 sedentary cashiers in Virginia and 800,000 nationally.  Production inspectors, these are people who inspect various products that are being produced, sedentary, 1,300 in Virginia, 56,000 nationally.
>
> ALJ:   Okay, that's enough.  Are they consistent with the DOT?
>
> VE:    They are.

(R. 57.)  In accordance with SSR 00-4p, the ALJ questioned the VE as to whether his testimony was consistent with the DOT, and the VE testified that it was.  But plaintiff asserts that the VE's representation is inaccurate, as the DOT does not list cashier or production inspector jobs that qualify as simple, unskilled, sedentary work.[2]  Pl.'s Br., Dkt. # 15, at 5-6.  Brooks argues "[t]his testimony by the VE is certainly in conflict with the DOT because the ALJ has assumably [sic] given a hypothetical with a job category that simply is not listed in these categories of the DOT.  The VE failed to detect this and the judge took no steps to resolve the conflict."  Id. at 6.

Contrary to Brooks' assertions, however, a VE can testify about information not listed in the DOT.  Social Security Ruling 00-4p recognizes that:

> Evidence from VEs or VSs can include information not listed in the DOT.  The DOT contains information about most, but not all, occupations. . . .  Information about a particular job's requirements

---

[2]  The VE did not reference specific DOT job numbers in his testimony.

> or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling.
>
> The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.  A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

This is precisely the sort of "reasonable explanation" for an apparent conflict between the VE testimony and the DOT, such as the one plaintiff alleges on appeal, that SSR 00-4p contemplates.

According to the case law, however, no such "reasonable explanation" was even necessary here, because there was no apparent conflict.  The VE affirmatively stated that his testimony was consistent with the DOT, and no party raised any issue with it at the administrative hearing.  Simply by inquiring whether the VE's testimony was consistent with the DOT, the ALJ discharged his duty under SSR 00-4p.  Pifer v. Astrue, No. 2:09-CV-63, 2010 WL 5621329, at *56 (N.D. W.Va. Dec. 30, 2010) (citing Street v. Comm'r of Soc. Sec., No. 08-14201, 2010 WL 1347605, at *5 (E.D. Mich. Mar. 31, 2010) (citing Martin v. Comm'r of Soc. Sec., 170 F. App'x 369, 374-75 (6th Cir. 2006))), adopted in 2011 WL 197914 (N.D. W.Va. Jan. 19, 2011).  "If the ALJ asks the VE if a conflict exists and the VE denies [it], the ALJ's duty ends." Id. (citing Martin, 170 F. App'x at 374; Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009)).  "'Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.'" Id. (citing Martin, 170 F. App'x at 374).

The regulations allow the Commissioner to use the services of vocational experts as well as other resources such as the Dictionary of Occupational Titles.  20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).  Thus, the ALJ was entitled to "rely on the VE's testimony in determining

whether a sufficient number of qualifying jobs exist in the national economy, without reference to the DOT." Scott v. Astrue, No. 5:10CV00032, 2010 WL 4817046, at *5 (W.D. Va. Nov. 19, 2010) (citing 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) and finding no discrepancy subject to the provisions of SSR 00-4p). Substantial evidence supports the Commissioner's decision in this respect.

## IV.

Plaintiff's second argument on appeal is that the ALJ erred in his RFC assessment and by finding plaintiff can perform her past relevant work. Contrary to plaintiff's assertions, however, the ALJ did not find at step four that plaintiff could perform her past relevant work. "The appropriate inquiry at step four of the evaluation process is whether the claimant's past relevant work would, as [s]he performed it, permit [her] to perform it with [her] current impairment. Rogers v. Barnhart, 216 F. App'x 345, 348 (4th Cir. 2007). In his decision, the ALJ stated:

> 6. The DDS [Disability Determination Services] determined that the claimant could perform her past relevant work (Exhibits 1B, 3B, 4B, and 10E).
>
> The claimant's past relevant work included light work as a cashier and the vocational expert identified sedentary cashier as an appropriate job placement for the claimant. The DDS vocational analysis indicated that the claimant had worked as a production inspector and had not been required to lift more than 10 pounds in that job (Exhibit 10E) and the vocational expert identified sedentary production inspector as an appropriate job placement.

(R. 18.) So while the ALJ noted that DDS found plaintiff could perform her past relevant work, the ALJ did not make such a finding himself. He correctly stated that plaintiff's past relevant work as a cashier and production inspector were performed at the light duty level, per the VE's testimony. (R.18, 56.) The ALJ determined, however, that plaintiff has the RFC for sedentary

work, not light work.[3]  Thus, he made no finding at step four that plaintiff could perform her past

relevant work.  Rather, he found at step five that there are jobs that exist in significant numbers

in the national economy that plaintiff can perform given her RFC for unskilled sedentary work

with a sit/stand option.  (R. 19.)  In making this determination, the ALJ relied on the VE's

testimony that plaintiff can work as a sedentary cashier (17,000 jobs in Virginia and 800,000

jobs nationwide) and as a sedentary production inspector (1,300 jobs in Virginia and 56,000 jobs

nationwide).  (R. 19, 57.)  Both of these are jobs plaintiff performed in the past, but not at the

sedentary level.  Therefore, the ALJ did not err by finding Brooks could perform her past

relevant work, as he made no such finding at step four.  The court thus turns to plaintiff's

arguments concerning the ALJ's RFC assessment.

### A.

Plaintiff argues the ALJ erred in his consideration of the opinions of two physicians at

Waynesboro Primary Care, Drs. Ritu Bakhru and Gina Engel.  Brooks asserts that the ALJ

incorrectly concluded that plaintiff can engage in full time work from a statement made on Dr.

Bakhru's treatment note.  She also claims the ALJ erred by rejecting Dr. Engel's finding on a

disability form that plaintiff is unable to work for more than sixty days.  Pl.'s Br., Dkt. # 15, at 8-

9.  Plaintiff asserts the ALJ had a duty to "resolve the opinions of the two doctors."  Pl.'s Br.,

Dkt. # 15, at 9.  For the following reasons, this argument fails.

Plaintiff has long been a patient of Waynesboro Primary Care and dozens of treatment

notes from this practice appear in the administrative record.  However, only one of those

treatment notes is signed by Dr. Bakhru.  Plaintiff presented to Dr. Bakhru on January 22, 2009

---

[3] ALJ noted that while he found the credible evidence of record to be consistent with the DDS assessments, "given the claimant's youth and the vocational expert's testimony, the claimant's disability status will not change even when I reduce her residual functional capacity to the sedentary exertional level, include a 'sit/stand option,' and include a restriction to simple unskilled work."  (R. 17.)  Giving plaintiff the benefit of the doubt, the ALJ limited her to sedentary work.

with a chief complaint of "urinary urgency and burning and right sided flank pain for the last

week." (R. 521.) Brooks also reported experiencing left handed numbness and right thumb

numbness over the preceding few months, which she claimed had been "interfering in her ability

to work as a cook for the public school so she really has not been working and is requesting

papers today for disability." [4] (R. 521.) With respect to the issue of disability, Dr. Bakhru stated

in her treatment notes:

> I did fill out [a] medical evaluation saying that she is able to
> participate in work approximately ten hours per week. The patient
> was informed of this. She says that if her condition worsens she
> will come back for a further evaluation. However at this time I do
> not see any medical reason why she should not work.

(R. 521.) Brooks alleges that the ALJ inaccurately concluded from this statement that Dr.

Bakhru felt she can engage in full-time, competitive work. Pl.'s Br., Dkt. # 15, at 8.

This statement cannot be read in context to mean that Dr. Bakhru limited plaintiff to only

ten hours of work per week, as plaintiff suggests. The actual medical evaluation filled out by Dr.

Bakhru is not in the record. The evaluation form[5] Dr. Bakhru refers to, however, contains three

checkbox options for doctors opining as to a patient's ability to participate in work activities:

> A. Able to participate in employment and training activities
>    without limitations or modifications.
>
> B. Able to participate in employment and training activities at
>    least 10 hours per week with limitations and/or modifications
>    as needed.
>
> C. Unable to participate in employment and training activities in
>    any capacity at this time.

---

[4] The court notes that this office visit with Dr. Bakhru occurred in early 2009; however plaintiff testified she stopped
working with the public schools in June 2007. (R. 27.)

[5] Although the medical evaluation filled out by Dr. Bakhru is not found in the record, it can be inferred that the
evaluation to which Dr. Bakhru refers is the same standard medical evaluation form that was filled out by Dr. Engel
and is found in the record.

(See R. 524.)  Given the statement in her treatment note, it appears Dr. Bakhru checked box B., which indicates she believed plaintiff could work **at least** ten hours per week but needed some limitations and/or modifications in order to do so – an opinion with which the ALJ agrees.  It is unclear exactly how many hours per week Dr. Bakhru thought Brooks could work because her medical evaluation is not in the record.[6]  But it is clear that Dr. Bakhru felt that Brooks could do at least some work.  (R. 521.)  The ALJ did not err in his characterization of this statement from Dr. Bakhru.

Even assuming that Dr. Bakhru intended to limit plaintiff to less than full time work, such an opinion would not be entitled to controlling weight.  A treating physician's opinion is to be given controlling weight by the ALJ if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.").  In determining the weight to give to a medical source's opinion, the ALJ must consider a number of factors, including whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist.  20 C.F.R. §§ 404.1527(d), 416.927(d).

Dr. Bakhru is a primary care physician, not a specialist.  According to the record, Dr. Bakhru examined plaintiff one time on January 22, 2009, and the objective findings set forth in the treatment note from that visit do not suggest that Brooks is totally disabled.  Dr. Bakhru

---

[6]  A series of checkboxes appears on the second page of the medical evaluation form under the direction:  "Please check the total number of hours per week that the patient can participate in employment and training activities." (See R. 525.)

10

stated as to her examination of Brooks: "Overall she appears well.  Mood and affect: are normal."  (R. 521.)  Reflexes in plaintiff's upper extremities were 2+ and normal, her grip strength was normal, her overall strength in her upper extremities was 5+ and her sensation was normal.  Dr. Bakhru noted plaintiff's diabetes was well controlled and her depression was stable.  She prescribed Cipro for Brooks' urinary urgency and Neurotonin for her upper extremity paresthesias.  And Dr. Bakhru stated:  "[A]t this time I do not see any medical reason why [Brooks] should not work."  (R. 521.)

The ALJ also considered Dr. Gina Engel's medical evaluation form, which is found in the administrative record.  Dr. Engel checked box C., which indicates Brooks is "[u]nable to participate in employment and training activities in any capacity at this time," (R. 524), and noted on the form that this incapacity was expected to last more than 60 days, specifically stating Brooks needed six months to participate in an outreach program geared at providing assistance to single mothers and their families.  (R. 524; see also R. 16, 522.)  Dr. Engel did not opine that Brooks is totally disabled.  See 42 U.S.C. § 423(d)(1)(A) (disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.").  Indeed, Dr. Engel stated on the form that she did not recommend Brooks apply for disability benefits, further indicating that she did not believe that Brooks was totally disabled.  (R. 524.)

Again, even if Dr. Engel's evaluation form could be interpreted as an opinion of total disability, such opinion is not supported by her objective findings.  Of the numerous records from Waynesboro Primary Care, only four treatment notes from Dr. Engel appear in the record.  Brooks first saw Dr. Engel on August 14, 2007 complaining of panic attacks and feeling stressed

and depressed.  At the time Brooks was having trouble with one of her four children, who had

been acting rebellious.  Dr. Engel noted Brooks was tearful throughout the visit, but the

examination was otherwise unremarkable.  Dr. Engel prescribed Lexapro and recommended

family counseling.  Plaintiff said her job with the school system had "given her some time off,"

and Dr. Engel suggested she try to maximize that time by getting her symptoms under control,

but noted that Brooks "will return to work on [August] 21st unless something comes up in [the]

meantime."[7]  (R. 312.)

Dr. Engel did not treat Brooks again until approximately one year later when Brooks

presented on July 10, 2008 with concerns about discoloration of her toenails.  Dr. Engel noted

the nails appeared normal and "look to be doing good."  (R. 518.)  On November 5, 2008, Dr.

Engel noted in her examination that "[o]verall she appears well.  Mood and affect are normal."

(R. 520.)  Dr. Engel stated Brooks' diabetes and depression were under control, and she

recommended plaintiff continue to work on diet and exercise.  (R. 519, 520.)  At a follow-up

appointment on February 3, 2009, Dr. Engel noted Brooks had "a lot of stress recently," but that

she had been doing fairly well on Lexapro.  (R. 522.)  Dr. Engel referred Brooks to a

psychologist, Dr. Darin Christensen,[8] and "filled out the paperwork for the patient to go to the

Outreach Program.  She will be out of work for the next six months while they help her with

this."  (R. 522.)  Nowhere in her treatment notes does Dr. Engel indicate that plaintiff cannot

engage in full time competitive work.  Thus, the ALJ correctly noted that "[n]o treating,

examining, or reviewing medical source has opined that the claimant is physically incapable of

---

[7]  Brooks did, in fact, get a work excuse from Dr. Marisa Christensen on August 21, 2007, which stated Brooks was unable to work for less than 60 days due to depression and anxiety and that she would be reevaluated in 7 to 10 days.  (R. 260.)  No further work excuses were given.

[8]  There are no treatment records from Dr. Darin Christensen in the administrative record.

light or sedentary work or that there has been or will be a period of twelve consecutive months when she was mentally incapable of working."  (R. 17.)

## B.

Indeed, the administrative record as a whole supports the ALJ's determination that Brooks has the RFC for simple, unskilled, sedentary work with a sit/stand option.  The majority of the treatment notes in the record from Waynesboro Primary Care are from Dr. Marisa D. Christensen, who has not opined that Brooks is totally disabled from competitive employment.[9] Prior to her alleged onset date, Brooks' diabetes was described as mild or borderline.  (R. 333, 336, 337, 338, 359, 366.)  And though she claims an onset date of January 1, 2006, Brooks did not seek medical attention for any impairment for the first three months of 2006.  Records indicate she presented to Waynesboro Primary Care three times in 2006 complaining of symptoms related to sinusitis, and she was treated with a Z-pack, Flonase and Claritin.  (R. 329, 331, 332.)  Throughout this time, her diabetes was noted to be mild and under good control, and she was encouraged to work on her diet and exercise.  (R. 329, 331, 332.)  She also sought medical attention at the emergency room on August 19, 2006 for right flank pain and was diagnosed with acute renal colic.  (R. 276.)  In early 2007, she was seen for complaints of a contusion on her hand (R. 275), flank pain likely related to a urinary tract infection (R. 328), a sebaceous cyst on her left breast and ongoing sinus congestion, (R. 326), and symptoms of an upper respiratory infection.  (R. 296.)  After her sugar tested higher in April, Brooks was prescribed Metformin, Glucophage and Amaryl in an effort to get her diabetes under control.  (R. 319, 320, 322, 324.)  By July, her diabetes was in much better control (R. 317), and after she

---

[9]  As noted <u>supra</u> in footnote 7, Dr. Marisa Christensen did fill out a medical evaluation form on August 21, 2007, indicating Brooks was unable to work for less than 60 days due to depression and anxiety with panic attacks and agoraphobia.  (R. 259-60.)  She stated Brooks would be reevaluated in 7 to 10 days.  (R. 260.)  No further work excuse was given, and there is no reference to disability in any other of Dr. Christensen's treatment notes.

subsequently experienced a few hypoglycemic episodes, her medication was adjusted. (R. 315, 317.) When she ran out of glucose test strips in December 2007, she reported to Dr. Marisa Christensen that her sugars were "out of control" (R. 454), but with another medication adjustment, this condition was noted to be much improved by early January 2008. (R. 453.) Save for one reference in a March 2008 treatment note to her diabetes being uncontrolled (even though at the time Brooks reported "that her sugars seem to be doing okay"), her diabetes was noted to be well controlled throughout 2008 and 2009. (R. 449, 483, 519, 521, 522.) The record reflects Brooks also lost a significant amount of weight during this time frame. (R. 483, 512, 518, 520.)

Brooks' chronic sinusitis and allergies were treated with medication and by June 2007 were under control. (R. 320.) Brooks also complained of pain in various areas of her body, mainly in August 2007. Brooks complained of pain in her right arm that started in her wrist and radiated up to her shoulder with attendant numbness in her three middle fingers. Upon examination, she was noted to have a positive Tinnel's sign on the right but full strength. Dr. Marisa Christensen stated these symptoms were likely associated with carpel tunnel syndrome. She prescribed ibuprofen and Ritalin and recommended exercises. (R. 315.) At an appointment a few weeks later, Brooks' left wrist was noted to be neurovascularly intact. (R. 312.) Brooks also complained of joint pain and swelling in August 2007. Examination was notable for a small amount of swelling at the wrist joints and MCP joints bilaterally, "a couple of actual nodules [were] noted over a couple of her PIP joints,"[10] and her shoulders were "a little bit warm to the touch." (R. 310.) Tests for rheumatoid arthritis were negative. (R. 308.) In the same month, Brooks complained of the inability to bear full weight through her knees and stated they were

---

[10] MCP is an abbreviation for metacarpophalangeal and PIP is an abbreviation for proximal interphalangeal. See http://medical-dictionary.thefreedictionary.com.

"locking up."  Examination was notable for left knee crepitus and pain with flexion and extension, as well as pain over the lateral joint line bilaterally.  However, there was no joint instability, no joint effusion, negative McMurray's test bilaterally and negative straight leg test.  (R. 304.)  X-rays of the knees were normal.  (R. 399.)  During the same office visit Brooks complained of pain in her right trapezius area that radiated to her mid-back.  She denied associated weakness or numbness.  She was diagnosed with a trapezius muscle strain and was given some stretching exercises and told to take ibuprofen.  She also complained of leg numbness during the night, which Dr. Marisa Christensen said was probably positional.  (R. 304.)

Records document the existence of a periumbilical hernia, which caused Brooks to seek attention at the emergency room on September 16, 2007.  A CT scan revealed Brooks had a small paraumbilical hernia with a small amount of fat in it, with no loops of bowel noted and no bowel obstruction.  (R. 291.)  The hernia was reduced by the doctor and plaintiff was discharged with instructions to make a follow up appointment and take Motrin.  (R. 289-90.)  The next office visit documented in the record, however, was on October 2, 2007, when Brooks complained of ongoing sinus congestion, not of anything related to her hernia.

There are also references throughout the medical records to inflamed sebaceous glands around plaintiff's breasts.  For this issue, she was treated with Keflex and instructed to use warm, moist compresses.  (See, e.g., R. 490.)  She was diagnosed with hidradenitis supperativa and referred to a plastic surgeon.[11]  (R. 484.)  Finally, the day before the administrative hearing,

---

[11]  Hidradenitis supperativa is defined as "a chronic suppurative and cicatricial disease of the apocrine gland-bearing areas, chiefly the axillae (especially in young women) . . . which is caused by poral occlusion with secondary bacterial infection of apocrine sweat glands.  It is characterized by the development of one or more tender red abscesses that enlarge and eventually break through the skin, yielding purulent or seropurulent drainage."  Dorland's Illustrated Medical Dictionary 852 (30th ed. 2003).

There are no records from a plastic surgeon in the administrative record.

plaintiff claims her "back gave out."  (R. 34.)  She went to the emergency room, was diagnosed

with an acute back strain, and was prescribed Flexeril and Percocet for pain.  She was advised to

follow up with Dr. Engel.  (R. 257.)

Plaintiff was treated conservatively for all of her physical impairments, and no doctor

opined that Brooks is totally disabled.  Reviewing state agency physician Syed Hassan, M.D.,

opined Brooks could perform a full range of medium work (R. 417-22), and state agency

physician William Amos, M.D., opined she could perform a limited range of light work.

(R. 468-73.)  The ALJ gave Brooks the benefit of the doubt by limiting her to sedentary work

with a sit/stand option.  The ALJ stated he found the credible evidence of record to be "generally

consistent with the DDS assessment. . . but that given the claimant's youth and the vocational

expert's testimony, the claimant's disability status will not change even when I reduce her

residual functional capacity to the sedentary exertional level, include a 'sit/stand option,' and

include a restriction to simple unskilled work."  (R. 17.)

## C.

With respect to her mental impairments, plaintiff takes issue with the fact that the ALJ

noted "that a production inspector or an inspector of food products (a job which the Plaintiff has

previously performed) would not involve a lot of social interaction," Pl.'s Br., Dkt. # 15, at 5

(quoting R. 19), but failed to include any depressive or mixed anxiety/panic disorder in his RFC

determination.  Id. (citing R. 13).  The ALJ did not find that Brooks' "reactive

depression/anxiety" to be severe impairments pursuant to the regulations, and likewise did not

see fit to include any related nonexertional limitations in his RFC assessment.  The evidence of

record supports that determination.  Prior to her alleged onset date, there are minimal references

in the medical records to plaintiff's complaints of anxiety or depression.  On May 23, 2005,

plaintiff stated she thought she was "falling apart" and felt very stressed and overwhelmed. However, her primary complaint during that visit was sinusitis.  (R. 335.)  Less than two weeks later, on June 3, 2005, she claimed to no longer be feeling overwhelmed or anxious.  (R. 334.) She was prescribed Alprazolam .5 mg in case the "throat pain and tightness" she was experiencing was not GERD-related but rather anxiety-related.  (R. 334.)  Notes from a December 2005 office visit indicate Brooks was "not having tremendous anxiety and is sleeping okay…."  (R. 333.)

There is no reference of depression or anxiety in the medical records again until July 31, 2007 when she presented to the emergency room after experiencing a panic attack brought on by anxiety over her glucose levels.  (R. 295.)  When she reported to Dr. Marisa Christensen for follow up on August 1, 2007, she made no mention of any depression or anxiety complaints. However, two weeks later, on August 14, 2007, Brooks complained to Dr. Engel of having panic attacks and being stressed and depressed.  At the time, plaintiff reported having difficulty with her eleven year old daughter.  She was prescribed Klonopin .5 mg and Lexapro 10 mg, and it was recommended that she seek counseling at Valley Community Service.  (R. 312.)  She reported having been given some time off by her work, was given a work note by Dr. Engel, and was to "return to work on the 21st unless something comes up in the meantime."  (R. 312.)  On August 21st, plaintiff presented to Dr. Marisa Christensen, reporting that her "symptoms have progressed to the point where she is really having difficulty leaving her house.  She can't even go to church anymore.  She has been on Lexapro now for one week and feels like she is doing a little bit better in terms of the depression, but she now feels like she is more anxious than she is depressed."  (R. 310.)  Brooks denied suicidality or homicidality and stated she planned to see

Valley Community Services Board for counseling the following day with her children.[12]

(R. 310.)  Dr. Christensen's assessment was as follows:

> Depression/anxiety:  This is a little bit improved after a week of Lexapro and she understands that this is going to take some more time.  She certainly is in no shape to return to work or educational activities at this time and she was given a note saying that she is to be off work until her next appointment [] which will be in a week to ten days.  She is starting counseling. . . .  I did recommend that she can go ahead and increase the Klonopin to .5 mg 1 or 2 tabs b.i.d. as needed.  Currently, she is just taking 1 at bedtime.

(R. 309-10.)  At a follow up appointment on August 30, 2007, Brooks reported that her anxiety had improved with Klonopin but she still felt "quite overwhelmed."  (R. 304.)  Upon examination, Dr. Marisa Christensen noted Brooks:

> appears somewhat stressed, but is pleasant, appropriate and polite. . . .  She's well groomed and well dressed.  Mood is described as overwhelmed and affect is congruent.  She has good eye contact. Speech is normal rate and volume.  No psychomotor agitation or retardation.  Thought content and processes are normal.  Judgment and insight are good.  No suicidality or homicidality.

(R. 304.)  Dr. Christensen switched plaintiff to Fluoxetine (Prozac) 40 mg daily and instructed her to try to obtain individual therapy and follow up in two weeks.  (R. 305.)  On September 13, 2007, Brooks started back on Lexapro after complaining of side effects from the Prozac.  (R. 302-03.)  By October 2, 2007, Brooks stated with regards to her depression that "she's still having 'whiney days' and she's not sleeping well at night, but overall she feels she's doing a little bit better."  (R. 455.)  Dr. Marisa Christensen noted as to her examination "Pysch: stable" and stated plaintiff was improving on Lexapro.  (R. 455.)  Brooks did not see Dr. Marisa Christensen again until December, when she claimed her depression was doing better but she was still having anxiety attacks.  Dr. Christensen noted "she endorses being mildly depressed and

---

[12]  There are no records from Valley Community Services in the administrative record.

affect is congruent with this."  (R. 454.)  Her Lexapro prescription was increased to 20 mg daily. (R. 454.)

At an appointment in January 2008, she was noted to be "pleasant and appropriate" and to "be doing much better."  (R. 453.)  In March 2008, Brooks reported being under more stress, as her daughter was experiencing psychiatric issues.  However, she also stated her mood was significantly improved.  (R. 451.)  In April Brooks continued to report issues with her daughter and increased stress, but stated the Lexapro was "quite helpful" despite the turbulence at home. (R. 449.)  She continued to seek family counseling services.  In June 2008, Brooks continued to report that the Lexapro was working well and stated she was not currently needing to use Klonopin for panic attacks.  Dr. Marisa Christensen's assessment was that "she's doing well on the current regimen.  She's not asking for any Klonopin at present.  We'll continue to monitor her closely."  (R. 483.)  There is no mention of anxiety or depression again until November, when Dr. Engel stated Brooks' depression seems to be under good control, that "[s]he has the very occasional panic attack or strange thoughts but overall her sleep and everything is fine." (R. 520.)  Brooks was instructed to continue taking Lexapro and call if any symptoms worsen. Notes from Dr. Bakhru in January 2009 again state that plaintiff was stable on Lexapro.  Dr. Bakhru noted, "I do not see any medical reason why she should not work."  (R. 521.)  In February, 2009, plaintiff complained to Dr. Engel of increased stress and was tearful during her appointment.  Nonetheless, Dr. Engel noted Brooks "is doing fairly well."  (R. 522.)  She referred Brooks to a psychologist, Dr. Darin Christensen, and filled out paperwork for the six month family outreach program.  (R. 522.)

Substantial evidence supports the ALJ's finding that Brooks' depression and anxiety are not severe impairments.  Under the regulations, an impairment is considered "severe" when it

significantly limits a claimant's physical or mental ability to perform basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a); see also 20 C.F.R. §§ 404.1520(c), 416.920(c).  Basic mental work activities include capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  Impairments must also last or be expected to last for a continuous period of at least twelve months to qualify as severe.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii); see also 42 U.S.C. § 423(d)(1)(A).

Brooks indeed struggled with a bout of depression, anxiety and agoraphobia around mid-2007.  But by October of that year, her condition had stabilized.  She was treated conservatively with medication by her primary care physician.  Notes reflect that she engaged in outpatient family counseling, but none of those counseling records appear in the administrative record.  Although it was recommended she seek individual counseling, there is no indication that she did so.  She was not referred to a psychologist until February 2009, when she complained of worsening anxiety, and it is unclear whether Brooks ever treated with this psychologist.

The reviewing state agency psychologist found that Brooks had  "Depression NOS" and "Anxiety Mixed and Panic D/O with Agoraphobia," resulting in mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, with no repeated episodes of decompensation.[13] (R. 427, 429, 435.)  In a Mental Residual Functional Capacity Assessment, this psychologist found Brooks to be moderately limited in several areas of functioning and not significantly limited in all others.  (R. 339-40.)  She found Brooks "is able to meet the basic mental demands

---

[13]  It is worth noting that this state agency review was conducted in November 2007, following Brooks' onset of anxiety symptoms a few months earlier in August.  Brooks' condition stabilized in the fall of 2007 and continued to remain stable throughout 2008.

of competitive work with limited social interaction on a sustained basis despite the limitations resulting from her impairment."  (R. 441.)  Although the ALJ did not include any limitation on social interaction in his RFC determination, he noted in his opinion that the job of production inspector, a job identified by the VE at the administrative hearing as one plaintiff could perform and had performed previously, would involve limited social interaction.  (R. 19.)

Even if Brooks' anxiety and depression could be considered severe impairments, any error at step 2 is harmless because the ALJ considered the effects of all of Brooks' impairments in the subsequent steps.  Miller v. Astrue, No. 8:10-1142-HMH-JDA, 2011 WL 1576203, at *15 (D.S.C. Apr. 7, 2011), adopted in 2011 WL 1561058 (D.S.C. Apr. 26, 2011).  Pursuant to 20 C.F.R. §§ 404.1523, 416.923, the ALJ must consider the combined effect of all of a claimant's impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity."  "Thus, the issue of whether or not a particular impairment is found [to be] severe is only critical if the ALJ ends the analysis at step two; if any impairment is severe, the ALJ must consider all impairments when assessing residual functional capacity."  Miller, 2011 WL 1576203, at *15 (citing 20 C.F.R. § 404.1545(a)(2), (e)).

In the instant case, the ALJ went through the medical evidence chapter and verse and expressly considered in detail the treatment notes as well as the findings of the state agency physicians concerning Brooks' mental impairments and the opinion evidence.  He also considered plaintiff's subjective complaints and statements about her limitations in conjunction with the objective medical evidence and found that the treatment records do not support the alleged severity of her symptoms.  Although the ALJ found plaintiff has medically determinable impairments of depression and anxiety, "he simply did not find any additional limitations were warranted in light of these impairments."  Williams v. Astrue, No. 0:10-004-JMC-PTG, 2011

WL 1261339, at *8 (D.S.C. Feb. 2, 2011), adopted in 2011 WL 1261327 (D.S.C. Mar. 31, 2011).

Plaintiff has not met her burden of providing she has any functional limitations stemming from

her mental impairments.  Thus, remand is not warranted on these grounds.

### D.

Indeed, considering the longitudinal medical record as a whole, the ALJ's RFC

determination is supported by substantial evidence.  Although her alleged date of disability is

January 1, 2006, Brooks continued to work through June 2007.  (R. 16, 27, 153.)  There is even a

reference in one of the treatment notes to Brooks working as a hair stylist in August 2007.  (R.

315.)  Brooks was often encouraged by her doctors to exercise, and in May 2007, just before she

stopped working, plaintiff stated she was walking two to three times per week.  (R. 322.)  Notes

from March 2008 reveal Brooks was walking on the treadmill for 30 minutes most days (R. 451),

and in April 2008 she reported walking 1 to 2 miles at a time, sometimes once or twice daily,

most days of the week.  (R. 449.)  This stands in sharp contrast to Brooks' statement at the June

2009 administrative hearing that she could stand for no more than half an hour and walk only a

block without having to stop and rest.  (R. 55.)  If anything, the medical records indicate Brooks'

condition improved, rather than deteriorated, in the intervening period.  Both her diabetes and

depression and anxiety stabilized with medication.  Moreover, Brooks indicated on her disability

application that she was able to care for herself and her four daughters, fix meals, help with

homework, do laundry, clean, shop for groceries.  (R. 191-201.)  The ALJ took into account the

medical evidence, plaintiff's subjective complaints, and her activities of daily living in a detailed

and well-supported opinion.  He gave Brooks the benefit of the doubt in terms of her physical

limitations, limiting her to sedentary work with a sit/stand option, despite the fact that the state

agency physicians found she could do light or medium work.  (R. 417-21, 468-74.)  In terms of

nonexertional issues, the ALJ limited plaintiff to simple, unskilled work.  He did not explicitly limit her social interaction but noted in his opinion that the job of production inspector would not involve much social interaction.  (R. 19.)  Taking the record as a whole, the ALJ's determination that Brooks is not disabled is supported by substantial evidence.

### V.

At the end of the day, it is not the province of the court to make a disability determination.  It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence, and, in this case, substantial evidence supports the ALJ's decision.  In holding that the final decision of the Commissioner is affirmed, the court does not suggest that Brooks is free from all pain or infirmity.  Careful review of the administrative record compels the conclusion that Brooks has not met her burden of establishing that she is totally disabled from all forms of substantial gainful employment.  The ALJ properly considered all of the subjective and objective factors in adjudicating Brooks' claim for benefits.  It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence.  For these reasons the Commissioner's decision is **AFFIRMED**, the Commissioner's Motion for Summary Judgment (Dkt. #16) is **GRANTED**, and Brooks' Motion for Summary Judgment (Dkt. #15) is **DENIED**.

The Clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to counsel of record.

Entered:  March 26, 2012

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge

23